WOELKE & ROMERO FRAMING, INC. *v.* NATIONAL
LABOR RELATIONS BOARD ET AL.

No. 80–1798.   Argued March 3, 1982—Decided May 24, 1982*

_____

*Together with No. 80–1808, *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc.* v. *National Labor Relations Board et al.;* and No. 81–91, *Oregon-Columbia Chapter, Associated General Contractors of America, Inc.* v. *National Labor Relations Board et al.*, also on certiorari to the same court.

646

Marshall, J., delivered the opinion for a unanimous Court.

*John W. Prager, Jr.*, argued the cause for petitioner in No. 80–1798. With him on the briefs was *Dwight L. Armstrong.*

*Lewis K. Scott* argued the cause for petitioners in Nos. 80–1808 and 81–91. With him on the briefs for petitioner in No. 81–91 was *David H. Wilson, Jr. Thomas M. Triplett* filed briefs for petitioner in No. 80–1808.

*Norton J. Come* argued the cause for respondent National Labor Relations Board. With him on the brief were *Solicitor General Lee, Elinor Hadley Stillman, Linda Sher*, and *John H. Ferguson.*

*Laurence Gold* argued the cause for respondent unions. With him on the brief were *Abe F. Levy, Gordon K. Hubel, Richard R. Carney, Laurence J. Cohen*, and *George Kaufmann.*†

Justice Marshall delivered the opinion of the Court.

In these consolidated cases, petitioners ask us to decide whether union signatory subcontracting clauses that are sought or negotiated in the context of a collective-bargaining

†Briefs of *amici curiae* urging reversal were filed by *Kenneth C. McGuiness, Robert E. Williams*, and *Daniel R. Levinson* for the Air Conditioning and Refrigeration Institute et al.; by *Richard P. Markey* for Associated Builders and Contractors; by *Peter G. Nash* for Associated General Contractors of America, Inc.; and by *Vincent J. Apruzzese, Francis A. Mastro, Lawrence B. Kraus*, and *Stephen A. Bokat* for the Chamber of Commerce of the United States of America.

Briefs of *amici curiae* were filed by *Gerard C. Smetana* for Donald Schriver, Inc., et al.; by *Michael C. Murphy* and *Hugh M. Davenport* for Georgia Power Co.; by *Peter R. Spanos* for the National Association of Home Builders; and by *Rex H. Reed* and *Joseph J. Hahn* for the National Right to Work Legal Defense Foundation.

relationship are protected by the construction industry proviso to § 8(e) of the National Labor Relations Act (Act), 29 U. S. C. § 158(e). Such clauses bar subcontracting except to subcontractors who are signatories to agreements with particular unions. Petitioners also ask us to decide whether a union violates § 8(b)(4)(A) of the Act, 29 U. S. C. § 158 (b)(4)(A), when it pickets to obtain a lawful subcontracting clause.

The United States Court of Appeals for the Ninth Circuit held that subcontracting clauses sought or negotiated in the context of a collective-bargaining relationship are protected by the construction industry proviso even when not limited in application to particular jobsites at which both union and non-union workers are employed. It further held that picketing to obtain such clauses does not violate § 8(b)(4)(A). See 654 F. 2d 1301 (1981) (en banc). We affirm the holding that the subcontracting clauses at issue here are protected by the construction industry proviso. Because we conclude that the Court of Appeals did not have jurisdiction to consider the picketing question, we do not review that portion of its decision.

## I

## A

These cases arise out of two separate labor disputes. The first involves petitioner Woelke & Romero Framing, Inc. (Woelke), a framing subcontractor in the construction industry in southern California. From July 1974 to June 1977, Woelke was party to a collective-bargaining agreement with respondent United Brotherhood of Carpenters and Joiners of America (Carpenters). Shortly before this agreement was to expire, Woelke and Carpenters commenced bargaining for the purpose of negotiating a successor agreement. In August 1977, however, the parties reached an impasse over Carpenters' demand for a union signatory subcontracting clause. This clause would have prohibited Woelke from subcontracting work at any construction jobsite "except to a person, firm or corporation, party to an appropriate, current

labor agreement with the appropriate Union, or subordinate body signatory to this Agreement." 1 App. 86.[1]

In support of Carpenters' demand for a subcontracting clause, two Carpenters locals picketed Woelke's construction sites, causing some work stoppages. Woelke filed unfair labor practice charges with the National Labor Relations Board, asserting that the subcontracting clause violated § 8(e) of the Act, which proscribes secondary agreements between unions and employers—that is, agreements that require an employer to cease doing business with another party, in order to influence the labor relations of that party. Woelke argued that because the clause violated § 8(e), Carpenters' picketing in support of that restriction violated § 8(b)(4)(A), 29 U. S. C. § 158(b)(4)(A).[2]

The Board agreed that the union signatory subcontracting clauses at issue were secondary in thrust. It ruled, however, that they were saved by the construction industry proviso to § 8(e), which exempts agreements between a union and employer concerning work to be performed at a construction jobsite. The Board rejected Woelke's contention that subcontracting clauses are sheltered by the proviso only if they are limited in application to particular jobsites at which both union and nonunion workers are employed. According

---

[1] The proposed clause provides in full:

"The Contractor agrees that neither he nor any of his subcontractors on the jobsite will subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work (including quarries, rock, san[d] and gravel plants, asphalt plants, ready-mix concrete plants, established on or adjacent to the jobsite to process or supply materials for the convenience of the Contractor for jobsite use) except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate Union, or subordinate body signatory to this Agreement." 1 App. 86.

The expiring contract contained a union signatory subcontracting clause that was similar in effect. *Id.*, at 28.

[2] Section 8(b)(4)(A) prohibits coercing "any employer or selfemployed person to join any labor or employer organization or to enter into any agreement which is prohibited by section 8(e)."

to the Board, such clauses are lawful whenever they are sought or negotiated "in the context of a collective bargaining relationship." *Carpenters Local No. 944 (Woelke & Romero Framing, Inc.)*, 239 N. L. R. B. 241, 250 (1978), citing *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S. 616 (1975). The Board further indicated that since the subcontracting clauses were lawful, picketing to obtain a sub-contracting proposal was permitted under § 8(b)(4)(A). *Carpenters Local No. 944, supra*, at 251.

## B

The second dispute concerns a collective-bargaining agreement between petitioner Oregon-Columbia Chapter of the Associated General Contractors of America, Inc. (Oregon AGC), and respondent Local 701 of the International Union of Operating Engineers, AFL–CIO (Engineers). Oregon AGC is an association of approximately 200 construction industry employers in Oregon and southwest Washington. Since 1960, the contract between Oregon AGC and the Engineers has contained a subcontracting clause prohibiting Oregon AGC from subcontracting construction jobsite work to "any person, firm or company who does not have an existing labor agreement with the [Engineers] Union covering such work." 2 App. 9–10; see *id.*, at 12.[3] In addition, the agreement authorized Engineers to take "such action as they deem necessary," including strikes and other economic self-help, to enforce awards obtained through the grievance and arbitration process on matters covered by the agreement. *Id.*, at 10.

In April 1977, petitioner Pacific Northwest Chapter of the Associated Builders and Contractors, Inc. (Pacific North-

___

[3] The clause provides in full:

"Employers shall not contract any work covered by this Agreement to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work to any person, firm or company who does not have an existing labor agreement with the Union covering such work." 2 App. 9–10.

west), a member of Oregon AGC, filed unfair labor practice charges, asserting that the contract between the Oregon AGC and the Engineers violated § 8(e). Relying on the same reasoning employed in *Carpenters Local No. 944,* the Board held that the union signatory subcontracting clauses, standing alone, would be protected by the construction industry proviso. *International Union of Operating Engineers, Local No. 701 (Pacific Northwest Chapter of Associated Builders & Contractors, Inc.),* 239 N. L. R. B. 274, 277 (1978). With one member dissenting, however, it decided that the provision of the contract permitting the union to *enforce* the subcontracting clause was not protected by the proviso. *Id.,* at 276.[4]

## C

Woelke, Oregon AGC, and Pacific Northwest all sought review of the Board's orders in the Court of Appeals.[5] The Ninth Circuit panel consolidated the cases and reversed the Board's decisions. It reasoned that the proviso was designed solely to minimize friction between union and nonunion workers employed at the same jobsite. Thus, the proviso shelters subcontracting clauses "only where a collective bargaining relationship exists and even then only when the employer or his subcontractor has employees who are members of the signatory union at work at some time at the jobsite at which the employer wishes to engage a nonunion subcontractor." 609 F. 2d 1341, 1347 (1979) (three-judge panel). Because it found that the clauses were unlawful, it did not reach the questions whether picketing or striking either to obtain or enforce a valid subcontracting clause was lawful. *Id.,* at 1351.

---

[4] The Board reasoned that the use of self-help measures would violate § 8(b)(4)(B) of the Act, 29 U. S. C. § 158(b)(4)(B). That section makes it an unfair labor practice for a union to force any person to "cease doing business with any other person."

[5] Petitioner Oregon AGC was technically a respondent in the Board proceeding. However, it supported the position taken by Pacific Northwest.

At respondents' request, the cases were reheard en banc. The en banc panel decided to enforce the Board's orders in their entirety. 654 F. 2d 1301 (1981). The majority held that union signatory subcontracting clauses are protected so long as they are sought or negotiated in the context of a collective-bargaining relationship.[6] *Id.*, at 1322. It further held that economic pressure may be used to obtain a subcontracting agreement, but that it may not be employed to enforce a subcontracting agreement. *Id.*, at 1323–1324.

Woelke, Oregon AGC, and Pacific Northwest asked this Court to review the conclusion that the subcontracting agreements sought by respondents are protected by the construction industry proviso. Woelke also asked this Court to decide whether unions violate § 8(b)(4)(A) when they picket to obtain lawful subcontracting clauses.[7] We granted certiorari. 454 U. S. 814 (1981).

## II

## A

Section 8(e), which was added to the Act by the 1959 Landrum-Griffin Act, Pub. L. 86–257, 73 Stat. 543–544, 29 U. S. C. § 158(e), states:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract

---

[6] The only other Court of Appeals to confront this question reached the same conclusion. See *Donald Schriver, Inc.* v. *NLRB*, 204 U. S. App. D. C. 4, 25, 635 F. 2d 859, 880 (1980), cert. denied, 451 U. S. 976 (1981), petition for rehearing pending, No. 80–1257.

[7] None of the petitioners sought review of the Court of Appeals' decision that economic pressure may not be used to enforce subcontracting agreements.

or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void."

The union subcontracting clauses at issue here fall within the general prohibition of § 8(e); they require the general contractor to boycott the services of nonunion subcontractors in order to influence the labor relations policies of the subcontractor. The construction industry proviso to § 8(e) states, however, that

"nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work."

Thus, the question we must answer here is whether the union signatory subcontracting clauses sought or obtained by respondent unions are protected by this proviso.

Read literally, the proviso would seem to shelter the subcontracting agreements—it expressly states that § 8(e) does not apply to agreements that limit the contracting of construction site work. In *Connell Construction Co. v. Plumbers & Steamfitters*, 421 U. S., at 628, however, this Court warned that § 8(e) "must be interpreted in light of the statutory setting and the circumstances surrounding its enactment." In that case, the Court decided that the proviso did not exempt subcontracting agreements that were not sought or obtained in the context of a collective-bargaining relationship, even though they were covered by the plain language of the statute. The Court reasoned that Congress did not intend to authorize such agreements.[8]

---

[8] In *Connell*, the Court was confronted with a novel and apparently foolproof organizational tactic: "stranger" picketing aimed at pressuring employers with whom the union had no collective-bargaining relationship, and whose

The subcontracting clauses at issue here were sought or negotiated in the context of collective-bargaining relationships. Petitioners argue, however, that we should further confine the scope of the proviso. They contend that Congress designed the proviso to solve the problems that arise when union and nonunion workers are employed at the same jobsite. Thus, it should be interpreted to protect only those agreements that are limited in application to construction projects where both union and nonunion workers are employed.

After examining the construction industry proviso "in light of the statutory setting and the circumstances surrounding its enactment," *Connell Construction Co.*, *supra*, at 628, we conclude that it should not be confined as petitioners suggest. The legislative history of § 8(e) and the construction industry proviso clearly indicates that Congress intended to protect subcontracting clauses like those at issue here.

### B

Prior to 1959, there were gaps in the existing protections against secondary boycotts. In *Carpenters* v. *NLRB,* 357 U. S. 93 (1958) *(Sand Door),* this Court held that a union could not engage in strikes or other concerted activity to enforce "hot cargo" agreements—agreements that required employers to boycott the goods or services of another party with

---

employees it had no interest in representing, into signing union signatory subcontracting agreements. Because there was no recognitional objective to the picketing, it did not violate § 8(b)(7), 29 U. S. C. § 158(b)(7). And because the subcontracting clause appeared to be protected by the construction industry proviso, the picketing was arguably not prohibited by § 8(b)(4)(A), 29 U. S. C. § 158(b)(4)(A), which bans picketing to secure agreements made unlawful by § 8(e). The Court concluded, however, that the protection of the proviso "extends only to agreements in the context of collective-bargaining relationships." *Connell Construction Co.* v. *Plumbers & Steamfitters,* 421 U. S., at 633. In these cases, we decide a question left unresolved in *Connell:* the extent to which the proviso shelters agreements sought or obtained within the context of a collective-bargaining relationship.

whom the union had a dispute. However, *Sand Door* indicated that employers and unions were free to enter into hot cargo agreements, and that compliance was lawful so long as it was voluntary. *Id.*, at 108.

Section 8(e), which prohibits hot cargo agreements, was designed to eliminate the loophole created by the *Sand Door* decision. See *Connell Construction Co., supra,* at 628. See also *National Woodwork Manufacturers Assn.* v. *NLRB,* 386 U. S. 612, 634 (1967). The provision represents a compromise between bills reported out by the Senate and House. The Senate bill would have outlawed hot cargo agreements only in the trucking industry. 105 Cong. Rec. 6556 (1959), 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 1161–1162 (1959) (Leg. Hist.). The legislation proposed by the House—the Landrum-Griffin bill—was much broader. It made it an unfair labor practice for *any* labor organization and *any* employer to enter into an agreement whereby the employer agrees to "cease doing business with any other person." H. R. 8400, 86th Cong., 1st Sess., § 705(b)(1) (1959), 1 Leg. Hist. 683. The Conference Committee decided to adopt the House bill. However, the Senate conferees insisted on a proviso that exempted hot cargo agreements in the garment industry, and also agreements relating to work to be done at the site of a construction project. 105 Cong. Rec. 17899 (1959), 2 Leg. Hist. 1432.

The legislative history contains several references to the construction industry proviso. After noting that the proviso extends only to work to be performed at the site of the construction, the Conference Report states:

"The committee of conference does not intend that this proviso should be construed so as to change the present state of the law with respect to the validity of this specific type of agreement relating to work to be done at the site of the construction project or to remove the limitations which the present law imposes with respect to such agreements. Picketing to enforce such contracts would

be illegal under the *Sand Door* case (*Local 1976, United Brotherhood of Carpenters* v. *NLRB*, 357 U. S. 93 (1958)). *To the extent that such agreements are legal today under section 8(b)(4) of the National Labor Relations Act, as amended, the proviso would prevent such legality from being affected by section 8(e)."* H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 39 (1959), 1 Leg. Hist. 943 (emphasis added).

Senator John F. Kennedy, who was chairman of the Conference Committee, provided a similar explanation during subsequent congressional debate.[9]

"The first proviso under new section 8(e) of the National Labor Relations Act is intended to preserve the present state of the law with respect to picketing at the site of a construction project and with respect to the validity of agreements relating to the contracting of work to be done at the site of the construction project." 105 Cong. Rec. 17900 (1959), 2 Leg. Hist. 1433.

Senator Kennedy also said:

"The Landrum-Griffin bill extended the 'hot cargo' provisions of the Senate bill, which we applied only to Teamsters, to all agreements between an employer and a labor union by which the employer agrees not to do business with another concern. The Senate insisted upon a qualification for the clothing and apparel industries and for agreements relating to work to be done at the site of a construction project. *Both changes were necessary to avoid serious damage to the pattern of collective bargaining in these industries."* 105 Cong. Rec. 17899 (1959), 2 Leg. Hist. 1432.

Other legislators expressed similar views. They emphasized that the final bill would not change the law with respect

---

[9] Since the proviso was added to § 8(e) at the Senate conferees' insistence, and since Senator Kennedy was chairman of the Senate conferees, his explanation of the clause is entitled to substantial weight.

to construction site subcontracting agreements. See 105 Cong. Rec. 18128 (1959), 2 Leg. Hist. 1715 (remarks of Rep. Barden); 105 Cong. Rec. 18135 (1959), 2 Leg. Hist. 1721 (remarks of Rep. Thompson); 105 Cong. Rec. 19849 (1959), 2 Leg. Hist. 1823 (postenactment memorandum by Sen. Dirksen); 105 Cong. Rec. 19772 (1959), 2 Leg. Hist. 1858 (postenactment memorandum by Sen. Goldwater).

These statements reveal that Congress wished "to preserve the *status quo*" regarding agreements between unions and contractors in the construction industry. *National Woodwork Manufacturers Assn., supra,* at 637. To the extent that subcontracting agreements were part of the pattern of collective bargaining in the construction industry, and lawful, Congress wanted to ensure that they remained lawful. Given this expression of legislative intent, we can determine whether the clauses challenged in these cases are within the scope of the proviso—or whether petitioners' narrow interpretation of the proviso is appropriate—by examining Congress' perceptions regarding the status quo in the construction industry.

There is ample evidence that Congress believed that union signatory contract clauses of the type at issue here were part of the pattern of collective bargaining in the construction industry. Comments made by Senator Kennedy clearly indicate that he believed broad subcontracting agreements were legal in 1959:

> "Agreements by which a contractor in the construction industry promises not to subcontract work on a construction site to a nonunion contractor appear to be legal today. They will not be unlawful under section 8(e). The proviso is also applicable to all other agreements involving undertakings not to do work on a construction project site with other contractors or subcontractors regardless of the precise relation between them." 105 Cong. Rec. 17900 (1959), 2 Leg. Hist. 1433.

Senator Kennedy's views were shared by other legislators. Senator Curtis, testifying before the Senate Labor Commit-

tee, stated that broad subcontracting agreements were not illegal, and were used "extensively" by the building trades unions.  Labor-Management Reform Legislation: Hearings on S. 505, S. 748, S. 76, S. 1002, S. 1137, and S. 1311 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 86th Cong., 1st Sess., 752 (1959) (Senate Hearings).  The House Labor Committee heard similar testimony.  Representatives of an employer and an independent union complained that employers and unions could lawfully enter into subcontracting clauses, and that, as a result, employers whose employees had selected another union were denied any opportunity to compete for construction jobs.  They described agreements very similar to those at issue here.  Labor-Management Reform Legislation: Hearings on H. R. 3540, H. R. 3302, H. R. 4473, and H. R. 4474 before a Joint Subcommittee of the House Committee on Education and Labor, 86th Cong., 1st Sess., 2363 (1959) (statement of Howard Lane) (House Hearings); *id.*, at 2365–2366 (statement of Edward M. Carlton).[10]

Petitioners argue that Congress' perception of the status quo was inaccurate.  According to petitioners, subcontracting clauses were not extensively used in the construction industry prior to 1959, and neither the Board nor the courts had ruled that such clauses were lawful.  However, "the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Brown* v. *GSA*, 425 U. S. 820, 828 (1976).  In any event, Congress' belief that subcontracting agreements were common and lawful was accurate.

The Board and the United States Court of Appeals for the District of Columbia Circuit had upheld broad subcontracting

---

[10] The employer and union representatives who testified before the House Labor Committee, as well as Senator Curtis, opposed the use of subcontracting clauses, arguing that they forced nonunion contractors out of business.  House Hearings 2366; Senate Hearings 752.  Significantly, despite this testimony, Congress decided to exclude the construction industry from the scope of § 8(e).

clauses. See *Associated General Contractors of America, Inc. (St. Maurice, Helmkamp & Musser)*, 119 N. L. R. B. 1026 (1957), review denied and enf'd *sub nom. Operating Engineers Local Union No. 3* v. *NLRB*, 105 U. S. App. D. C. 307, 266 F. 2d 905, cert. denied *sub nom. St. Maurice, Helmkamp & Musser* v. *NLRB*, 361 U. S. 834 (1959).[11] Significantly, petitioners are unable to point to any pre-1959 cases in which a subcontracting agreement was found to be unlawful because it was not limited to particular jobsites at which the signatory union workers were employed.

A report published in 1961, which examined "the prevalence and characteristics of subcontracting provisions in effect in 1959 in the construction industry," indicates that broad subcontracting agreements were quite common. Lunden, Subcontracting Clauses in Major Contracts, 84 Monthly Lab. Rev. 579 (1961). The study examined 155 construction contracts, covering 700,000 construction workers, and found that 444,000 of those workers were employed under contracts with subcontracting provisions. *Id.*, at 582. The most frequent requirement, found in more than 50 major contracts, obligated contractors to subcontract work only to subcontractors who would apply all the "terms and conditions" of the master agreement. *Id.*, at 715–716. The Lunden report does not describe a single agreement that limited the applicability of a subcontracting restriction to jobsites at which both union and nonunion workers were employed.[12]

---

[11] In *Operating Engineers Local Union No. 3* v. *NLRB*, the Court of Appeals approved the Board's conclusion that a contractor did not violate the Act by complying with a subcontracting clause under which it was not permitted to subcontract engineering work to a firm that did not observe the terms of the union's contract. The employer and union representatives who testified before the House Labor Committee referred to the case. House Hearings 2364, 2367. The text of the Court of Appeals decision was introduced into the record of the House Hearings. *Id.*, at 801, 803–807.

[12] Petitioners suggest that the Lunden study did not adequately distinguish between broad union signatory clauses like those at issue here and union standards clauses—clauses that permit general contractors to subcontract to nonunion subcontractors, so long as the subcontractors are will-

In short, Congress believed that broad subcontracting clauses similar to those at issue here were part of the pattern of collective bargaining prior to 1959, and that the Board and the courts had found them to be lawful. This perception was apparently accurate. Thus, endorsing the clauses at issue here is fully consistent with the legislative history of § 8(e) and the construction industry proviso.

## III

Petitioners attach little significance to the legislative history we have just described. Instead, they focus on congressional references to this Court's decision in *NLRB* v. *Denver Building & Construction Trades Council*, 341 U. S. 675 (1951) *(Denver Building Trades)*, which they believe support their narrow interpretation of the proviso. They also contend that if the clause is interpreted to protect any subcontracting agreements sought or obtained in the context of a collective-bargaining agreement, unions will have a potent organizational weapon. However, neither of these arguments compels the adoption of a restricted interpretation of the proviso.

---

ing to comply with the standards set forth in the union's contract. However, the Board's General Counsel, who conducted his own study of subcontracting restrictions in the construction industry, and who did distinguish between various types of restrictions, found union signatory clauses very similar to those at issue here in roughly 12% of the contracts studied. NLRB General Counsel's Memorandum, Dec. 15, 1976, 93 Lab. Rel. Rep. 390, 404, reprinted in 1976 Lab. Rel. Yearbook 295, 309.

Broad subcontracting clauses have been part of the pattern of collective bargaining in southern California, where the *Woelke & Romero* case arose, since 1941. See Pierson, Building–Trades Bargaining Plan in Southern California, 70 Monthly Lab. Rev. 14, 17 (1950); see also 1 App. 20–22. The Pierson study also noted that similar bargaining arrangements existed in other localities, including the Portland, Ore., area, where the *Pacific Northwest* case arose. Pierson, *supra*, at 15. See also Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv. L. Rev. 1086, 1119 (1960) (construction industry proviso "approves the general practice of the building trades to secure from a contractor a promise that he will not subcontract work on the job site to a nonunion subcontractor").

## A

Petitioners contend that Congress adopted the construction industry proviso primarily because it wanted to overrule this Court's decision in *Denver Building Trades, supra*. That case held that picketing a general contractor's entire project in order to protest the presence of a nonunion subcontractor is an illegal secondary boycott. According to petitioners, Congress disliked the *Denver Building Trades* rule because it might lead to uneasy employee relationships on the jobsite: if union workers were forced to work alongside nonunion workers, friction might result. Given this congressional purpose, the proviso should be interpreted as permitting only those subcontracting agreements that are designed to reduce friction at particular jobsites.

Petitioners are correct in suggesting that the decision in *Denver Building Trades* contributed to Congress' decision to adopt the construction industry proviso. See *Connell Construction Co.*, 421 U. S., at 629. At the time Congress was considering the proper scope of § 8(e), it had before it several proposals that would have effectively overruled the *Denver Building Trades* decision. See, *e. g.*, § 702(d) of H. R. 8342, 86th Cong., 1st Sess. (1959), 1 Leg. Hist. 752–753 (Elliot bill). "It was partly in this frame of reference that the [construction industry] proviso to Section 8(e) was written." 105 Cong. Rec. 20005 (1959), 2 Leg. Hist. 1861 (remarks of Rep. Kearns).

It is clear, however, that those who wished to overrule *Denver Building Trades* were concerned about more than the possibility of jobsite friction. Critics of *Denver Building Trades* complained that contractors and subcontractors working together on a single construction project are not the sort of neutral parties that the secondary boycott provisions were designed to protect. They pointed out that the *Denver Building Trades* rule denied construction workers the right to engage in economic picketing at their place of employment. And they emphasized that the employees of various subcontractors have a close community of interest, and that the

wages and working conditions of one set of employees may affect others.[13]   In fact, as the Court of Appeals noted, the problem of jobsite friction between union and nonunion workers received relatively little emphasis.   See 654 F. 2d, at 1319.

The proviso helps mitigate the impact of the *Denver Building Trades* decision: although it does not overrule the ban on picketing, it confirms that construction industry unions may enter into agreements that would prohibit the subcontracting of jobsite work to nonunion firms.   However, petitioners' argument—that the proviso was intended primarily as a response to *Denver Building Trades*, and that it should therefore be interpreted as protecting only those clauses designed to prevent jobsite friction—rests on faulty premises.   As we have already shown, see *supra*, at 654–661, the proviso was not designed solely as a response to the *Denver Building Trades* problem.   And even as a response to *Denver Building Trades*, the proviso is only partly concerned with jobsite friction.[14]

## B

Petitioners further contend that if the subcontracting clauses at issue here are approved, the unions will have a powerful organizing tool.   Subcontractors will not be able to obtain work unless their employees are represented by the union.   Thus, they will force their employees to become members of the union.   In effect, the subcontracting clauses

---

[13] 105 Cong. Rec. 17881, 2 Leg. Hist. 1425 (remarks of Sen. Morse); 105 Cong. Rec. 15541 (1959), 2 Leg. Hist. 1577 (memorandum by Reps. Thompson and Udall); 105 Cong. Rec. 15551–15552 (1959), 2 Leg. Hist. 1588 (memorandum by Rep. Elliott); 105 Cong. Rec. 15852 (1959), 2 Leg. Hist. 1684 (remarks by Rep. Goodell).

[14] It is important to recognize, however, that reducing jobsite friction is a legitimate purpose.   The clauses at issue here serve this goal by ensuring that members of the respondent unions need not work alongside nonunion employees.

will create a "top-down" pressure for unionization; they will take the representation decision out of the hands of the employees and place it in the hands of the employers.

It is undoubtedly true that one of the central aims of the 1959 amendments to the Act was to restrict the ability of unions to engage in top-down organizing campaigns. See *Connell Construction Co.*, *supra*, at 632 (discussing legislative history). It is also true that secondary subcontracting agreements like those at issue here create top-down organizing pressure. However, even if the agreements were limited in application to jobsites at which both union and nonunion workers were employed, there would be some topdown organizing effect. Such pressure is implicit in the construction industry proviso. The bare assertion that a particular subcontracting agreement encourages top-down organizing pressure does not resolve the issue we confront in these cases: how much top-down pressure did Congress intend to tolerate when it decided to exempt construction site projects from § 8(e)? As we have already explained, we believe that Congress endorsed subcontracting agreements obtained in the context of a collective-bargaining relationship— and decided to accept whatever top-down pressure such clauses might entail. Congress concluded that the community of interests on the construction jobsite justified the top-down organizational consequences that might attend the protection of legitimate collective-bargaining objectives.[15]

The top-down organizing effect of subcontracting clauses sought or obtained in the context of a collective-bargaining

---

[15] It may be true, as petitioners emphasize, that the use of union signatory subcontracting clauses will give a particular union a monopoly position in a labor market. However, the Board has previously suggested that in most labor markets, apart from some minor overlaps, there is only one union representing a particular craft. See *Carpenters Local 15*, 240 N. L. R. B. 252, 261 (1979). In addition, as Congress recognized, see S. Rep. No. 187, 86th Cong., 1st Sess., 28 (1959), a majority of the workers skilled in a particular craft will belong to that union.

relationship is limited in a number of ways by other provisions of the National Labor Relations Act.[16]   A subcontractor cannot be subjected to unlimited picketing to force it into a union agreement without regard to the wishes of its employees.   See 29 U. S. C. § 158(b)(7)(C).[17]   An additional safeguard is provided by § 8(f), 29 U. S. C. § 158(f), which authorizes unions and employers in the construction industry to enter into collective-bargaining agreements, even though the employees of that employer have not designated the union as their lawful bargaining representative.   When a union obtains a subcontracting clause from a general contractor, subcontractors frequently attempt to ensure that they remain eligible for work by entering into a § 8(f) agreement—known as a prehire agreement—with the union.   If they do so, however, § 8(f) expressly states that their employees may challenge the union's representative status by filing an election petition with the Board.   And the subcontractors themselves, if they do not have a stable work force among whom the union has secured a majority, may be free to repudiate the agreement at any project on which the union has not demonstrated that it represents a majority of their employees. See *NLRB* v. *Iron Workers*, 434 U. S. 335 (1978); *Giordano Construction Co.*, 256 N. L. R. B. 47, 47–48, 107 LRRM 1164, 1165–1166 (1981).

Despite petitioners' assertions to the contrary, nonunion employees are not frozen out of the job market by subcontracting agreements.   Even where construction unions successfully negotiate collective-bargaining agreements that require both general contractors and subcontractors to obtain

---

[16] Many of these protections would not have been available to limit the top-down organizing effect of the clauses at issue in *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S. 616 (1975).

[17] As we note below, see *infra*, at 665–666, we do not reach the question whether a union may use economic pressure to obtain a subcontracting agreement.   We also do not reach the question whether a union may picket to obtain a prehire agreement.

their labor from union hiring halls, the union must refer both members and nonmembers to available jobs. 29 U. S. C. §§ 158(a)(3), 158(b)(2).[18] In addition, Courts of Appeals have suggested that the obligations of union membership that may be required under union security clauses after seven days are limited to the normal financial obligations of membership.[19]

Finally, since the *Denver Building Trades* rule remains in effect, employees working for firms with whom a construction union has a primary dispute are protected against secondary picketing designed to force them off their current job. And as the Court of Appeals held in these cases, even where construction unions have negotiated secondary clauses that are sheltered by the proviso, they may not enforce them by picketing or other forms of concerted activity. See H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 39 (1959), 1 Leg. Hist. 943; 105 Cong. Rec. 19772 (1959), 2 Leg. Hist. 1858 (postenactment memorandum of Sen. Goldwater).

## IV

Petitioner Woelke asks us to reverse the Court of Appeals' holding that unions do not violate § 8(b)(4)(A) when they picket to obtain a subcontracting clause sheltered by the construction industry proviso. However, the Court of Appeals was without jurisdiction to consider that question. The issue was not raised during the proceedings before the Board, either by the General Counsel or by Woelke. Thus, judicial review is barred by § 10(e) of the Act, 29 U. S. C. § 160(e), which provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." See *De-*

---

[18] See *Radio Officers* v. *NLRB*, 347 U. S. 17, 40–42 (1954); *Teamsters* v. *NLRB*, 365 U. S. 667, 673–677 (1961).

[19] See *NLRB* v. *Hershey Foods Corp.*, 513 F. 2d 1083, 1085–1087 (CA9 1975); *Local 1104, Communications Workers of America* v. *NLRB*, 520 F. 2d 411, 417–420 (CA2 1975), cert. denied, 423 U. S. 1051 (1976).

*troit Edison Co.* v. *NLRB*, 440 U. S. 301, 311–312, n. 10 (1979); *Garment Workers* v. *Quality Mfg. Co.*, 420 U. S. 276, 281, n. 3 (1975); *NLRB* v. *Ochoa Fertilizer Corp.*, 368 U. S. 318, 322 (1961).

The § 10(e) bar applies even though the Board held that the picketing was not banned by § 8(b)(4)(A). See *Carpenters Local No. 944,* 239 N. L. R. B., at 251. Woelke could have objected to the Board's decision in a petition for reconsideration or rehearing. The failure to do so prevents consideration of the question by the courts. See *Garment Workers* v. *Quality Mfg. Co., supra,* at 281, n. 3.

Because the Court of Appeals lacks jurisdiction to review objections that were not urged before the Board, we do not reach the question whether the picketing was lawful. Instead, we vacate that portion of the Court of Appeals' judgment that relates to this issue, and remand with instructions to dismiss.

## V

We hold that the construction industry proviso to § 8(e) of the National Labor Relations Act ordinarily shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective-bargaining relationship, even when not limited in application to particular jobsites at which both union and nonunion workers are employed. This interpretation of the proviso is supported by its plain language, as well as the legislative history. Thus, we affirm the decision below, insofar as it holds that the clauses at issue here were sheltered by the proviso. We further hold that the Court of Appeals was without jurisdiction to decide whether a union violates § 8(b)(4)(A) when it pickets to obtain a lawful subcontracting clause. We vacate that portion of the judgment below, and remand for further proceedings consistent with this opinion.

*It is so ordered.*