# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 18, 2011    Decided August 5, 2011

No. 10-1260

SPECTRUM HEALTH -- KENT COMMUNITY CAMPUS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 10-1270

———

On Petition for Review and Cross-Application
for Enforcement of An Order of
the National Labor Relations Board

———

*Peter J. Kok* argued the cause for petitioner. With him on the briefs were *Nathan D. Plantinga* and *Gregory P. Ripple*.

*Richard A. Cohen*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Fred B. Jacob*, Deputy Assistant General Counsel.

Before: HENDERSON, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Spectrum Health -- Kent Community Campus withdrew recognition from its employees' union after receiving a petition indicating that the union no longer had majority support. The National Labor Relations Board found this action unlawful because it occurred within the first three years of the parties' collective bargaining agreement, during which time a union enjoys a conclusive presumption of majority support. Spectrum argues that the term of the collective bargaining agreement began more than three years before it withdrew recognition, and that the conclusive presumption had therefore lapsed. Spectrum also objects to the Board's imposition of an affirmative bargaining order.

We conclude that the Board properly interpreted the term of the collective bargaining agreement, and that Spectrum waived its objections to the bargaining order by failing to raise them in a timely manner before the Board. Accordingly, we deny Spectrum's petition for review and grant the Board's cross-application for enforcement.

I

Spectrum operates a hospital in Grand Rapids, Michigan. In late 1999, the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW), and its Local 2600, became the exclusive bargaining representative for a sizeable unit of Spectrum's employees. In November 2004, Spectrum and the union began to negotiate a successor to a 2002 collective bargaining agreement set to expire on December 31, 2004. During the course of

negotiations, the parties extended the 2002 agreement to January 15, 2005, but did not agree on a second extension. As a consequence, the agreement expired on that date. It was not until late March 2005 that the parties reached a tentative agreement on a new collective bargaining agreement. The union's members ratified that agreement on April 13, and it was executed two days later, on April 15, 2005.

The following statement was written at the bottom of the cover of the 2005 agreement: "DATE OF AGREEMENT: JANUARY 1, 2005 THROUGH MARCH 31, 2008." Agreement Between Spectrum & Local 2600, UAW (J.A. 272) [hereinafter CBA]. However, the first paragraph of the document, under the heading "AGREEMENT," stated: "This is an Agreement by and between [Spectrum and the union], effective April 13, 2005." CBA para. 1. The final section of the contract, under the heading "TERMINATION," stated: "This Agreement shall remain in force until 12:01 a.m., April 1, 2008." *Id.* § 77. Among other provisions, the agreement provided for annual wage increases for both "future hires" and "incumbent employees." Future hires, defined as those hired on or after April 13, 2005, were to receive wage reclassifications "[e]ffective with the first payroll periods beginning after April 13, 2005, April 13, 2006, and April 13, 2007." *Id.* § 69(a)(i). Incumbent employees, defined as those hired on or prior to April 12, 2005, were to receive an initial 4.5 percent raise "[d]uring the first year of the contract, . . . retroactive to January 1, 2005," and additional raises "[a]t the beginning of the second and third contract years." *Id.* § 69(a)(ii). The agreement contained two other provisions, relating to changes in Spectrum's retirement and health plans, that were also specifically made retroactive to January 1, 2005.[1]

_____

[1]Section 61 designated a new default health insurance plan to be effective "as soon as is feasible after January 1, 2005," capped the

On January 7, 2008, Spectrum withdrew recognition from the union based upon its receipt of a petition, signed by a majority of the bargaining unit employees, stating that they no longer wanted to be represented by the union. The next day, Spectrum announced to employees that the UAW contract was no longer in effect. Top Spectrum officials began a series of meetings with employees in which they announced that recognition of the union had been withdrawn due to a loss of majority support and that the company was considering annual spring wage and benefit adjustments. In late February, Spectrum posted a notice of "Town Hall Meetings" to be held on March 3 and March 7, promising "Exciting News for Former UAW Staff." At those meetings and in subsequent mailings to employees, the company announced a series of wage and benefit improvements, effective March 2, and suggested that further wage adjustments would occur in October 2008. The company also denied a grievance filed under the collective bargaining agreement, taking the position that grievances would instead be handled under Spectrum's non-bargained "fair treatment" policy.

In response to these actions, the union filed an unfair labor practice charge against Spectrum, and the General Counsel of the National Labor Relations Board (NLRB) subsequently issued a complaint. On September 4, 2008, an Administrative Law Judge (ALJ) found that Spectrum had violated

_____

premium contributions that participants in the former plan had to pay between January 1 and December 31, 2005, and set out revised health insurance benefits and obligations of employees who retired on or after January 1, 2005. CBA § 61. Section 68 provided that "[n]o employee hired on or after January 1, 2005" could participate in the "Spectrum Health -- Kent Community Campus Retirement Plan and Trust." CBA § 68.

sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA).[2]

As Spectrum acknowledges, under longstanding NLRB precedent a union enjoys "a conclusive presumption of majority status during the term of any collective-bargaining agreement, up to three years." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996); *see Raymond F. Kravis Ctr. for the Performing Arts, Inc. v. NLRB*, 550 F.3d 1183, 1188 (D.C. Cir. 2008); *Shaw's Supermarkets*, 350 N.L.R.B. 585, 587-88 (2007); Spectrum Br. 13, 15. "This conclusive presumption . . . arises not from an absolute certainty that the union continues to enjoy majority status, but from the National Labor Relations Act's purpose of fostering industrial peace by promoting stable collective bargaining relationships." *McDonald Partners, Inc. v. NLRB*, 331 F.3d 1002, 1005-06 (D.C. Cir. 2003) (citing *Auciello*, 517 U.S. at 785-90). The Board has clarified that this irrebuttable presumption becomes rebuttable after the agreement expires or after the third year of an agreement of longer duration. *Shaw's Supermarkets*, 350 N.L.R.B. at 587-88. At that point, an employer may withdraw recognition if it has untainted evidence of a union's actual loss of majority support. *Id.*; *see Raymond F. Kravis*, 550 F.3d at 1189 n.1.

---

[2]Section 8(a) makes it an "unfair labor practice for an employer . . . (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7 of the NLRA] . . . [or] (5) to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a). Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining . . . ." *Id.* § 157.

It is undisputed that the petition Spectrum received would have constituted sufficient evidence to rebut the presumption if the three-year period had passed. Thus, as the ALJ recognized and Spectrum agreed, Spectrum's liability depends entirely on whether the term of the 2005 agreement began more or less than three years before January 7, 2008, the date of the employer's withdrawal. *See Spectrum Health -- Kent Community Campus*, 353 N.L.R.B. No. 99, at 5 (Feb. 26, 2009) (ALJ Op.); Spectrum Br. 13, 15. Spectrum argued that the term began on January 1, 2005, the date inscribed on the cover of the agreement. The General Counsel maintained that it began on April 13, 2005, the effective date listed in the agreement's first paragraph.

The ALJ concluded that the agreement itself was "at best . . . ambiguous as to its term," but that parol evidence -- specifically, the bargaining history of the agreement -- confirmed that the parties intended it to begin on April 13, 2005. ALJ Op. at 6. Having thus found that the term of the agreement began "no earlier than April 2005," the ALJ concluded that Spectrum's January 2008 withdrawal of recognition and repudiation of the agreement, its refusal to recognize and bargain with the union thereafter, its ensuing unilateral changes in the terms and conditions of employment, and its promise of future benefits, were all unlawful. *Id.* at 7, 10-11.[3] The ALJ ordered Spectrum to cease and desist from the unfair labor practices the judge had found and to bargain with the union. *Id.* at 11-12.

---

[3]The ALJ also considered, and rejected, Spectrum's argument that the conclusive presumption of majority support applies only when an agreement is unambiguous on its face. ALJ Op. at 8-10. Spectrum does not repeat that argument before us.

On February 26, 2009, a two-member panel of the Board adopted the findings and recommendations of the ALJ.[4] The Board also explained its decision to adopt the ALJ's affirmative bargaining order. 353 N.L.R.B. No. 99, at 1-2 (Board Op.). Spectrum filed a motion for reconsideration, which the Board denied on April 21, 2009. On August 17, 2010, the Board vacated its February 2009 decision after the Supreme Court held, in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), that two-member panels of the Board were without authority to decide cases under the NLRA. Shortly thereafter, a three-member panel of the Board adopted the February 2009 decision by reference. *Spectrum Health -- Kent Community Campus*, 355 N.L.R.B. No. 101 (Aug. 23, 2010).

Spectrum has now petitioned for review by this court, and the Board has filed a cross-application for enforcement. The company contends that the term of the 2005 bargaining agreement began on January 1, 2005, and that the conclusive presumption of majority support had therefore lapsed by the time it withdrew recognition from the union on January 7, 2008. Our review is de novo because "[t]his court owes no deference to the Board's interpretation of a disputed collective bargaining agreement." *Commonwealth Commc'ns, Inc. v. NLRB*, 312 F.3d 465, 468 (D.C. Cir. 2002); *see Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202-03 (1991). The company also objects to the Board's imposition of an affirmative bargaining order. We consider the term of the agreement in Part II and Spectrum's objections to the bargaining order in Part III.

---

[4]In so doing, the Board chose not to rely on the ALJ's finding that the January 1, 2005 date on the cover was an inadvertent mistake. In addition, one member of the panel noted that, although he did not find the parol evidence conclusive, he found it sufficient to meet the General Counsel's burden. *Spectrum*, 353 N.L.R.B. No. 99, at 1 n.3 (Board Op.).

II

Spectrum contends that the cover on the 2005 collective bargaining agreement stated its term unambiguously: "DATE OF AGREEMENT: JANUARY 1, 2005 THROUGH MARCH 31, 2008." If the agreement had otherwise been silent as to the dates of its operation, Spectrum's position might well be compelling. But the agreement was not otherwise silent. The first and last paragraphs provided that "[t]his is an Agreement . . . effective April 13, 2005," that "shall remain in force until 12:01 a.m., April 1, 2008." CBA para. 1 & § 77. We agree with the Board that these and other textual provisions are at least as probative of the agreement's term as the statement on the cover. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (noting that a "cardinal principle of contract construction [is] that a document should be read to give effect to all its provisions and to render them consistent with each other").

Spectrum denies that there is any inconsistency between the cover and the text, insisting that the first paragraph simply memorialized the date upon which the agreement was ratified and became legally enforceable. It is of course possible that the parties intended the date April 13, 2005 to have no further significance, but that is not clear on the face of the agreement. Indeed, other provisions strongly suggest that April 13, 2005 marked the beginning of the first year of the contract.

As noted in Part I above, one subsection of the agreement provided that incumbent employees would receive a wage increase "[d]uring the first year of the contract, . . . *retroactive* to January 1, 2005." CBA § 69(a)(ii) (emphasis added). This retroactivity provision would not have been needed if the first year of the contract itself began on January 1, 2005 -- or, as Spectrum puts it, if the parties had made the term of the entire

contract retroactive to January 1, 2005. The same is true of two other provisions that the contract specifically made retroactive. *See supra* note 1. It is possible, as Spectrum suggests, that these express statements of retroactivity were merely redundant expressions of the parties' intent to make the entire contract retroactive. As is true of drafters of legislation, drafters of contracts do sometimes take a belt-and-suspenders approach in order "to make assurance doubly sure," *United States v. Hansen*, 772 F.2d 940, 947 (D.C. Cir. 1985). But *three* sets of belts and suspenders seem a bit much, especially when no other contract provision included such accessories and yet, on Spectrum's theory, all were similarly retroactive.

The conclusion that the term of the contract as a whole began on April 13, 2005, is also consistent with other parts of the agreement's wage section. CBA § 69. Subsection 69(a)(i) provided that future hires would receive wage reclassifications "[e]ffective with the first payroll periods beginning after April 13, 2005, April 13, 2006, and April 13, 2007." CBA § 69(a)(i). The incumbent employee subsection, which came next, not only gave incumbent employees retroactive raises "[d]uring the first *year* of the contract," but also provided for additional raises "[a]t the beginning of the second and third contract *years*." *Id.* § 69(a)(ii) (emphasis added). Spectrum concedes the context indicates that, under this section, the first *year* of the contract began on April 13, 2005 -- not January 1 -- and that the second and third contract years were to begin on April 13 of each subsequent year. Oral Arg. Recording 5:29-6:14 (statement of Spectrum counsel).

Even if the text of the agreement alone does not resolve the issue, we agree with the ALJ that "at best for Respondent's argument," the unexplained discrepancy between the dates on the cover page and the contractual provisions cited above renders the agreement "ambiguous as to its term." ALJ Op. at

6. In the presence of ambiguity, "we must look to parol evidence to determine the parties' intent." *Commonwealth Commc'ns, Inc.*, 312 F.3d at 466; *see Am. Postal Workers Union v. U.S. Postal Serv.*, 940 F.2d 704, 707-08 (D.C. Cir. 1991). And in this case, the extrinsic evidence -- specifically, the bargaining history -- confirms the Board's contention that the parties did not intend to make the term of the entire agreement retroactive to January 1, 2005.[5]

In a January 14, 2005 draft, the "effective" and "termination" dates in the body of the agreement matched the dates stated on the cover -- both indicating that the agreement would run between January 1, 2005 and November 1, 2007.

---

[5]The Board's General Counsel bears the burden of proving a violation of the NLRA by a preponderance of the evidence. *See* 29 U.S.C. § 160(c); *Cincinnati Newspaper Guild, Local 9 v. NLRB*, 938 F.2d 284, 286 (D.C. Cir. 1991); *Gateway Concrete Forming Servs.*, 274 N.L.R.B. 154, 158 (1985). Spectrum suggests that the General Counsel bears a heavier burden in this case, claiming that under the Board's decision in *Des Moines Register & Tribune Co.*, 339 N.L.R.B. 1035, 1037 (2003), *pet. for rev. denied*, *Des Moines Mailers Union, Teamsters Local No. 358 v. NLRB*, 381 F.3d 767 (8th Cir. 2004), "the party that bears the burden of proof in a contract interpretation matter . . . must clearly establish his interpretation as the correct expression of the parties' intent," Spectrum Reply Br. 4. But *Des Moines Register* does not contain such a rule. In that case, the Board said only that the General Counsel must prove the terms of the agreement. 339 N.L.R.B. at 1037-38. It concluded that the General Counsel had failed to do so because the provision of the collective bargaining agreement at issue was ambiguous, and the General Counsel did not present extrinsic evidence to shed light on the parties' intent. *Id.*; *see Des Moines Mailers Union*, 381 F.3d at 770. In this case, by contrast, the General Counsel presented extrinsic evidence, which resolves in his favor any ambiguity in the contract language. Nothing more is required to satisfy the preponderance of evidence standard.

Draft Agreement Between Spectrum and Local 2600, UAW (Jan. 14, 2005) (J.A. 145). On March 23, 2005, however, Spectrum suggested that the parties "consider instead entering into a 3 year agreement which would expire three years after ratification/final approval by the union." 2004 Collective Bargaining Negotiations, Eighth Bargaining Session (Mar. 23, 2005) (J.A. 219). The bargaining notes indicate that "[t]he parties will consider this possibility, but absent agreement to the contrary, the contract would expire as previously agreed (i.e.: November 2, 2007)." *Id.* On March 31, the parties did reach agreement. Consistent with Spectrum's proposal, the effective date in the body of the new version was changed from January 1, 2005 to April 13, 2005, and the termination date was changed from November 1, 2007 to April 1, 2008 (at 12:01 a.m.), thus providing the (approximately) three-year term that Spectrum had proposed. Indeed, as NLRB counsel points out, "'12:01 a.m. on April 1, 2008'" was "three years to the minute after the anniversary of the date, March 31, on which the parties' negotiators had reached a tentative agreement." NLRB Br. 12.

The cover of the agreement was likewise changed to reflect the new termination date of March 31, 2008. The bargaining notes do not explain why the initial date on the cover was not also changed to reflect the new effective date of April 13, 2005. Although Spectrum insists this was a deliberate expression of the parties' intent to make the entire agreement retroactive to January 1, 2005, the bargaining history indicates otherwise. The negotiations over the wage provisions reveal that the parties intended the first year of the contract term to begin in April 2005, not on January 1, 2005. Spectrum accepted a union proposal for annual three-percent raises for future hires, but only on the condition that the increases take effect on "anniversaries of contract effective date, not 'January 1.'" 2004 Collective Bargaining Negotiations (Mar. 31, 2005) (J.A. 220). Spectrum agreed to make raises for incumbent employees "[*r*]*etroactive*

to January 1, 2005," but it warned that its "offer of retroactivity" would expire if the union failed to approve the contract by a certain date. *Id.* (emphasis in original). This suggests that the initial date on the cover was left as January 1, 2005 to reflect the fact that the incumbent hire provision -- and the two others listed in footnote 1 above -- applied retroactively to that date, not to suggest that the entire agreement was retroactive.

In sum, like the ALJ and the Board, we find that the term of the collective bargaining agreement began on its effective date, April 13, 2005. That finding is dispositive of Spectrum's liability under the Act. Because the union still enjoyed a conclusive presumption of majority support when Spectrum withdrew recognition less than three years later, on January 7, 2008, Spectrum's withdrawal and subsequent actions violated sections 8(a)(1) and 8(a)(5).[6]

III

Spectrum's second contention is that the facts of this case do not justify an affirmative bargaining order and that the Board failed to conduct the fact-specific analysis this circuit requires before the Board can impose such an order. *See Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000). We

---

[6]In light of this disposition, we do not consider the Board's alternate argument that, as a matter of federal labor law policy, the three-year period of repose must run from the date of contract formation, even if the parties agree on a retroactive effective date. NLRB Br. 33-34, 37. In any event, this argument "is nowhere to be found in the orders under review," and is therefore a post hoc rationalization that we may not consider. *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 739 (D.C. Cir. 2000). In fact, the orders below assume the opposite, conceding that Spectrum would not be liable if the parties had intended the term to begin retroactively on January 1, 2005. ALJ Op. at 5.

may not consider this contention, however, because Spectrum failed to raise it before the Board in a timely fashion.

Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see id.* § 160(f). The Supreme Court has held that, pursuant to section 10(e), the failure to assert an objection before the Board deprives the courts of appeals of jurisdiction to consider it. *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982).

In its exceptions to the ALJ's decision, Spectrum did not raise any specific objection to the ALJ's imposition of an affirmative bargaining order. Instead, in a list of 103 exceptions, the company said only that it excepted to the ALJ's proposed remedy "in its entirety." Resp't's Exceptions to ALJ's Findings & Decision (Nov. 5, 2008) (NLRB Supp. App. 10). We have repeatedly held this exact formulation insufficiently specific to preserve an objection to a bargaining order. *Prime Serv., Inc. v. NLRB*, 266 F.3d 1233, 1241 (D.C. Cir. 2001); *Quazite Div. of Morrison Molded Fiberglass Co. v. NLRB*, 87 F.3d 493, 497 (D.C. Cir. 1996); *see Highlands Hosp. Corp. v. NLRB*, 508 F.3d 28, 32-33 (D.C. Cir. 2007); *Scepter v. NLRB*, 280 F.3d 1053, 1057 (D.C. Cir. 2002); *see also* 29 C.F.R. § 102.46(b)(2) ("Any exception to a ruling, finding, conclusion or recommendation which is not specifically urged shall be deemed to have been waived."). Spectrum does not dispute that its exception to the ALJ's decision was too general to satisfy section 10(e). *See* Spectrum Reply Br. 28-29; Oral Arg. Recording 28:00-29:05.

Although Spectrum did eventually raise specific objections to the bargaining order in its motion for reconsideration, "[b]y

the time [the petitioner] objected to the bargaining order in a motion for reconsideration, it was too late." *Parkwood Developmental Ctr., Inc. v. NLRB*, 521 F.3d 404, 410 (D.C. Cir. 2008); *see Elmhurst Care Ctr. v. NLRB*, 303 F. App'x 895, 897 (D.C. Cir. 2008); *NLRB v. Local Union No. 74*, 471 F.2d 43, 46 (7th Cir. 1973); *A.H. Belo Corp. v. NLRB*, 411 F.2d 959, 967 (5th Cir. 1969). As we held in *Parkwood*, to preserve objections for appeal a party must raise them in the time and manner that the Board's regulations require. 521 F.3d at 410. Those regulations provide that "[n]o matter not included in exceptions . . . may thereafter be urged before the Board, or in any further proceeding." 29 C.F.R. § 102.46(g). "Having failed to exhaust its administrative remedies under the Board's rules, *see* 29 C.F.R. § 102.46(g) . . . , and having shown no 'extraordinary circumstances' for this failure, *see* 29 U.S.C. § 160(e)," Spectrum "may not raise this objection now." *Elmhurst Care Ctr.*, 303 F. App'x at 897; *see also Elastic Stop Nut Div. v. NLRB*, 921 F.2d 1275, 1284 (D.C. Cir. 1990) ("[S]ection 10(e) is an example of Congress's recognition that . . . 'courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.'" (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952))).[7]

---

[7]As we noted in *Parkwood*, the Board's regulations provide that it will "only entertain a motion for reconsideration in 'extraordinary circumstances.'" 521 F.3d at 410 (quoting 29 C.F.R. § 102.48(d)(1)). There, as here, "[t]he Board found no such circumstances." *Id.*; *see Spectrum Health -- Kent Community Campus*, Order Den. Mot. for Recons. (J.A. 59) (denying Spectrum's motion because it "does not present extraordinary circumstances necessary under Section 102.48(d)(1) . . . to warrant reconsideration of the Board's decision"). And as we said in *Parkwood*, "we must defer to the Board's interpretation of its own regulations because that interpretation is neither plainly erroneous nor inconsistent with the regulations." 521

There may be circumstances in which a motion for reconsideration is the first opportunity a party has to raise objections -- where, for example, the Board sua sponte decides an issue not expressly presented to it by the parties or addressed by the ALJ. Under those circumstances, the objections will be preserved by a timely motion to reconsider. *See Woelke*, 456 U.S. at 665-66; *W & M Properties v. NLRB*, 514 F.3d 1341, 1345 (D.C. Cir. 2008); *Flying Food Group, Inc. v. NLRB*, 471 F.3d 178, 185-86 (D.C. Cir. 2006).[8] This, however, is not such a case because here the Board adopted the same bargaining order imposed by the ALJ. It is true that Spectrum "could not have faulted the Board's reasoning in a filing that preceded the Board's order" adopting that of the ALJ. *Parkwood*, 521 F.3d at 410. But it "could have alerted the Board to the possibility that a bargaining order was unwarranted in this instance. Its failure to do so deprives us of jurisdiction to consider the remedial challenge." *Id.* Because we may not review the Board's bargaining order, a fortiori we may not review its rationale. *Id.*

Nor does it matter that the Board addressed the merits of Spectrum's objections in the course of denying its motion for reconsideration. "As the Supreme Court has made clear, . . . '[t]he § 10(e) bar applies even though' the Board has decided the issue." *Highlands Hosp. Corp.*, 508 F.3d at 33 (quoting *Woelke*, 456 U.S. at 666). "[T]he fact that the Board has or has

F.3d at 410.

[8]This is what we meant by our dictum in *W & M Properties* that, "[i]f aggrieved by the Board's remedy, W & M should have filed a motion for reconsideration pursuant to the Board's rules and regulations." 514 F.3d at 1345. Spectrum misreads this as holding that a motion for reconsideration always suffices to preserve an objection not previously made.

not discussed an issue raises no necessary inferences with respect to section 10(e)." *Local 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 727 F.2d 1184, 1192 (D.C. Cir. 1984); *see id.* at 1191 ("[T]he statute requires objection to the Board, and not discussion by the Board, before an issue may be presented in court."); *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999) ("[S]ection 10(e) bars review of any issue not presented to the Board, even where the Board has discussed and decided the issue.").[9] Accordingly, the Board's consideration does not change our determination that we may not consider Spectrum's objections to the bargaining order.

## IV

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered.*

---

[9] Spectrum interprets our decision in *Burinskas v. NLRB* as holding that the Board's consideration of an objection preserves the objection for review. 357 F.2d 822 (D.C. Cir. 1966). But in *Burinskas*, the court found that the employer had timely excepted to the back pay remedy in the trial examiner's initial report, and then objected again both before and after the Board issued a supplemental decision upon remand from this court. *Id.* at 825. Although the court noted that "the Board, through its agent, the Compliance Officer, ha[d] considered the objection," this merely confirmed that the Board could not "now claim that the objection . . . was not properly before it." *Id.* at 826.