**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 18-1256**

―――――――――

PUTNAM CENTER,

        Petitioner,

     v.

UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES,

        Respondent.

―――――――――

On Petition for Review of an Order of the Department of Health & Human Services. (A-17-53)

―――――――――

Argued: January 29, 2019                     Decided: May 8, 2019

―――――――――

Before THACKER and RICHARDSON, Circuit Judges, and TRAXLER, Senior Circuit Judge.

―――――――――

Petition for review denied by unpublished opinion. Judge Thacker wrote the majority opinion, in which Senior Judge Traxler joined. Judge Richardson wrote a dissenting opinion.

―――――――――

**ARGUED:** Joseph L. Bianculli, HEALTH CARE LAWYERS, PLC, Arlington, Virginia, for Petitioner. Suzanne Keir Yurk, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Philadelphia, Pennsylvania, for Respondent. **ON BRIEF:** Robert P. Charrow, General Counsel, Washington, D.C., Jan M. Lundelius, Chief Counsel, Office of General Counsel, Region III, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Philadelphia, Pennsylvania, for Respondent.

―――――――――

Unpublished opinions are not binding precedent in this circuit.

THACKER, Circuit Judge:

In this case, Petitioner Putnam Center ("Putnam"), a nursing facility located in Hurricane, West Virginia, seeks review of a final decision of the Departmental Appeals Board ("the Board") of the Department of Health and Human Services ("HHS"). That decision upheld the imposition of enforcement remedies against Putnam based on findings that Putman failed to comply with federal regulations governing nursing facilities that participate in Medicare and Medicaid. Because we conclude that the Board's decision was based on substantial evidence and was neither arbitrary nor capricious, we deny Putnam's petition for review.

I.

A.

*Statutory and Regulatory Background*

The Medicare program, enacted under Title XVIII of the Social Security Act, provides publicly funded health insurance coverage to eligible individuals for medical care. *See* 42 U.S.C. § 1395, *et seq.* This includes care provided by skilled nursing facilities such as Putnam. *See id.* § 1395i-3(a). To participate in Medicare, a skilled nursing facility must remain in substantial compliance with the statutory and regulatory program participation requirements. *See id.* § 1395i-3(a)–(d); 42 C.F.R. §§ 483.1, 488.400. "Substantial compliance" is defined as "a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.

3

To ensure that facilities comply with the program participation requirements, the Centers for Medicare and Medicaid Services ("CMS"), the federal agency within HHS tasked with administering the programs, contracts with state agencies to perform surveys -- i.e., unannounced inspections -- of the facilities. *See* 42 U.S.C. § 1395aa; 42 C.F.R. § 488.10. In this case, that state agency was the West Virginia Department of Health and Human Resources, Office of Health Facility Licensure and Certification ("OHFLAC"). Following such a survey, OHFLAC reports any deficiencies it finds, along with the scope and severity of those deficiencies, to CMS. A "deficiency" is defined in the regulations as any failure to comply with a Medicare participation requirement, and noncompliance means "any deficiency that causes a facility to not be in substantial compliance." 42 C.F.R. § 488.301.

If a survey reveals that a skilled nursing facility is not in substantial compliance with the program participation requirements, CMS may impose enforcement remedies against the facility as permitted by the regulations. *See* 42 U.S.C. § 1395i-3(h)(2); 42 C.F.R. § 488.406. Among other enforcement remedies, CMS may impose a per-day fine for each day that a facility is not in substantial compliance with a regulatory requirement. *See* 42 C.F.R. § 488.430(a). The amount of this per-day fine depends on the severity of the noncompliance, ranging from $50 to $3,000 per day for less serious noncompliance, or $3,050 to $10,000 per day for more serious noncompliance that poses "immediate jeopardy" to the health and safety of residents. *See id.* § 488.438(a). "Immediate jeopardy" exists when "the provider's noncompliance with one or more requirements of

4

participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." *Id.* § 488.301.

The program participation requirement at issue in this case is the quality of care requirement, which provides as follows:

> Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care.

42 C.F.R. § 483.25.[1]

## B.

### *Factual and Procedural Background*

OHFLAC conducted a survey of Putnam from October 13, 2014, through October 21, 2014. Based on the surveyor's findings, CMS concluded that from February 17, 2014, through December 16, 2014, Putnam was not in substantial compliance with the quality of care requirement for one of its residents, identified as Resident 87 ("the Resident"), because for eight months it failed to provide or facilitate a necessary full dental extraction for the Resident. *See* 42 C.F.R. § 483.25.

The Resident, a 62 year old man at the time of the survey, was admitted to Putnam in April 2013 after a serious surgery and period of hospitalization. The Resident's health

---

[1] On November 28, 2016, this provision was amended. Section 483.25 now provides that facilities must ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive care plan, and the resident's choices. *See* 81 Fed. Reg. 68,688, 68,848 (Oct. 4, 2016). Because the fines at issue in this case were imposed on October 15, 2014, the prior provision applies.

declined after this surgery: he lost more than 100 pounds and suffered from type II diabetes, congestive heart failure, pulmonary hypertension, chronic back pain, and liver cirrhosis. The Resident also had recurring bouts of aspiration pneumonia, which is secondary to pulmonary aspiration (inhaling saliva or other objects into the lungs). When the Resident was admitted into Putnam's care, he was missing at least three teeth and the rest were decayed and rotting. Upon his admission, Putnam took note of the poor condition of the Resident's teeth.

1.

*The Resident's Dental Consultations*

On October 8, 2013, the Resident complained to Putnam's staff about tooth pain, and Putnam arranged a dental appointment for the next day. At this appointment, the dentist recommended that the Resident have a complete extraction of his remaining teeth. Thereafter, the dentist referred the Resident to an oral surgeon at Mountain State Oral and Maxillofacial Surgeons ("Mountain State") for the full dental extraction procedure with intravenous ("IV") sedation. The dentist noted that the procedure required medical clearance by a physician and possibly an anesthesiologist. Therefore, Dr. Christopher Skaggs, the Resident's primary care physician and Putnam's Medical Director, wrote a note dated October 16, 2013, which stated: "may have teeth extractions with local or minimal [twilight] sedation only." A.R. 1577, 2230, 4735.[2]

---

[2] Citations to the "A.R." refer to the Administrative Record filed by the parties in this appeal.

6

Before the Resident could see the oral surgeon, he was hospitalized for aspiration pneumonia from November 22 to November 29, 2013. The discharge report from this hospital stay stated that the Resident needed a full dental extraction due to multiple infected teeth. When the Resident returned from the hospital, Putnam scheduled an appointment for the Resident to see the oral surgeon at Mountain State in February 2014.

Before this appointment, at the end of January 2014 and the beginning of February 2014, Mountain State's office staff faxed Putnam a list of information and documents that it needed before the surgery could be scheduled, including a completed health history form, medical clearance from an attending physician, and a medical power of attorney. After receiving this fax, Putnam sent Mountain State the Resident's completed health history form, consents for anesthesia and extraction, and Dr. Skaggs's October 16 note. But Mountain State informed Putnam that Dr. Skaggs's note was insufficient to serve as a medical clearance for the Resident because Dr. Skaggs's name was not on the document, his signature was not legible, and the note did not address whether the Resident was on blood thinners and, if so, when they should be discontinued prior to the procedure.

The Resident saw the oral surgeon at Mountain State on February 17, 2014. At that consultation, the oral surgeon explained the risks and benefits of the procedure and noted that the Resident consented to the procedure. The oral surgeon made a note that his office would "try to obtain clearance from [the Resident's] physician, coordinate his care[,] and see if he is a candidate for either [monitored anesthetic care] or general anesthesia in a hospital setting." A.R. 1592, 2216.

## 2.

### *Clearance Stalemate and the Resident's Ongoing Health Issues*

After the Resident's February 2014 consultation, Mountain State made repeated requests to Putnam for medical clearance for the Resident to have the surgery. When Putnam did not respond, Mountain State's office manager re-sent the request every two weeks, except for the period when she was on maternity leave. From time to time, between March 4 and April 2, 2014, staff from Putnam and Mountain State spoke on the phone regarding the Resident's surgery. Mountain State's office manager noted that she consistently told Putnam that the oral surgeon needed an updated and correct medical clearance prior to scheduling the procedure. Despite this, Putnam did not send the requested clearance.

On June 8, 2014, the Resident was again hospitalized for sepsis and aspiration pneumonia. While at the hospital, the Resident developed acute respiratory failure, and he was placed under general anesthesia while his tracheotomy tube was replaced. The Resident's treating physicians noted that he needed a full dental extraction because his "severe periodontal disease" was a cause of his recurring pneumonia, and further noted that his underlying medical condition "limits anesthetic options." A.R. 1627. The hospital attempted to schedule the extraction procedure while the Resident was admitted, but it did not have the appropriate equipment to perform the surgery at that time. The discharge instructions directed that, because the Resident's periodontal disease was causing his recurrent pneumonia, he needed to return to the hospital "in the very near future" for the dental extraction, and that "[f]urther arrangements for this will be made

8

through the skilled nursing facility." *Id.* at 1634. However, Putnam made no efforts to schedule the surgery.

On July 23, 2014, Mountain State again requested medical clearance for the Resident's extraction surgery, this time by sending a letter to the Resident himself. Putnam was aware of the request, but it did not provide the clearance for the surgery. A Putnam staff member stated that she called Mountain State to inform them that because the Resident was hospitalized and not currently a resident, Putnam could not provide the clearance. However, just one day later -- July 24, 2014 -- the Resident was re-admitted to Putnam, and Putnam took no action on Mountain State's request. On September 27, 2014, the Resident was again admitted to the hospital with pneumonia. Following that hospital visit, Putnam still did not take any action to schedule the Resident's dental extraction.

3.

*Putnam's Survey and the Resident's Procedure*

When OHFLAC surveyed Putnam in October 2014, the Resident was randomly selected to be interviewed. During his interview on October 14, 2014, the Resident complained that he had been having tooth pain, that his teeth were causing him health problems, and that he was waiting to have all his teeth extracted. The surveyor investigated and discovered that the condition of the Resident's teeth had been known to the staff at Putnam since his admission in April 2013 and that Putnam had failed to respond to Mountain State's request for medical clearance since February 2014.

When the surveyor interviewed Dr. Skaggs, Dr. Skaggs denied ever having a conversation about the Resident's medical clearance after his October 16, 2013 note.[3] Dr. Skaggs asserted, however, that he would not have cleared the Resident for the surgery because he was too ill. Dr. Skaggs wrote a letter dated October 20, 2014, asserting that in his professional opinion, the Resident "ha[d] not been medically stable to undergo complete dental extraction from February 2014 [through] June 2014." A.R. 1743, 2135.

After the surveyor's investigation began, Putnam took steps to obtain medical clearance for the Resident's surgery. On October 21, 2014, the Resident's pulmonologist provided that clearance. The clearance noted that the extraction was warranted despite the fact that the Resident was a high-risk patient to "hopefully prevent recurrence of [aspiration] pneumonia." A.R. 1602–03. The Resident underwent the full dental extraction on January 15, 2015. After the surgery, his medical condition improved.

4.

*CMS's Finding of Noncompliance*

At the completion of Putnam's survey on October 21, 2014, OHFLAC submitted a statement of deficiencies to CMS, citing several deficiencies in Putnam's compliance with the regulations. As relevant here, the surveyors determined that Putnam had not been in substantial compliance with the quality of care requirement as a result of

---

[3] This statement contradicted the accounts of Putnam's nurse and the director of nursing, who both stated that Putnam consulted Dr. Skaggs about the clearance after Mountain State sent its request for clearance to the Resident on July 23, 2014. According to the nurse, Dr. Skaggs told her at that time that the clearance would have to come from the Resident's pulmonologist.

Putnam's failure to arrange the dental extraction procedure, and that this deficiency posed an immediate jeopardy because the resident experienced actual harm (e.g., pain and recurrent bouts of aspiration pneumonia) and potential harm (e.g., abscesses and infection).

On December 1, 2014, Putnam submitted its plan for correction of the deficiencies, including scheduling the Resident for his full dental extraction. After a follow up visit, OHFLAC determined that Putnam corrected all the deficiencies. Accordingly, CMS determined that Putnam's period of noncompliance with 42 C.F.R. § 483.25 was from February 17, 2014, to December 16, 2014. CMS found that for a portion of that time -- from February 17, 2014, through October 15, 2014 -- Putnam's noncompliance placed the Resident in immediate jeopardy. Accordingly, CMS imposed a fine of $5,100 per day for the period of immediate jeopardy (which spanned 241 days, for a total of $1,229,100), and a fine of $250 per day for the remaining period of noncompliance (which spanned 62 days, for a total of $15,500). This amounted to a total fine of $1,244,600.

5.

*The ALJ's Decision*

Putnam appealed CMS's decision to an HHS Administrative Law Judge ("ALJ"), who conducted a de novo review of the record.[4] Putnam asserted that there was no

_____

[4] Putnam first challenged CMS's finding and fine through an informal dispute resolution, and the decision was upheld.

11

factual or legal basis for CMS's finding of immediate jeopardy. Putnam asserted that the delay in scheduling the Resident's surgery was due to a disagreement between the oral surgeon and the Resident's primary care physician regarding the Resident's anesthesia options. According to Putnam, the oral surgeon would only perform the surgery using general anesthesia, but Dr. Skaggs's October 16, 2013 note ordered that the surgery could not be done under general anesthesia, and Putnam was required to follow Dr. Skaggs's order. Putnam also argued that the Resident was too ill to have the surgery during the alleged period of noncompliance.

The ALJ considered medical records as well as testimony of physicians and other staff members of Putnam and Mountain State. While Dr. Skaggs stated that he considered the periodontal disease less significant than the Resident's many other health issues because it did not interfere with the Resident's quality of life, an oral surgeon testifying on behalf of CMS stated that periodontal disease has the potential for becoming acute and causing health problems, including sepsis. Further, the oral surgeon testified that because the Resident had dysphagia and recurrent aspiration pneumonia, bacteria from the periodontal disease in his mouth could be aspirated and cause systemic infections.

The Resident, who remained competent and able to express himself throughout this entire period, asserted to the ALJ that he believed Putnam had done nothing wrong, that he had many ongoing medical issues at the time, and that he was in poor dental health for a long time but it had never caused him much pain.

The ALJ affirmed CMS's determination that Putnam failed to comply with 42 C.F.R. § 483.25, but he determined that the noncompliance did not begin until July 25, 2014. Specifically, the ALJ determined that between February and June of 2014, the Resident's health rendered him ineligible for the extraction surgery. Accordingly, the ALJ reduced the amount of the fine to $438,800. The ALJ cited Dr. Skaggs's October 20 letter, the Resident's hospitalizations between February and June of 2014, the hospital's attempts to schedule the procedure in June 2014, physician testimony on the Resident's suitability for surgery, the conceded improvement of the Resident's condition after the June tracheostomy, and Putnam's failure to attempt to schedule the extraction surgery after the tracheostomy.

The ALJ noted that there was no contemporaneous evidence that Dr. Skaggs evaluated the Resident's suitability for the procedure or addressed his periodontal disease after October 2013. The ALJ also noted that Putnam failed to provide the requested clearance after Dr. Skaggs's October 16, 2013 note was deemed insufficient to serve as such. Consequently, the ALJ determined that the delay was due to Putnam's staff's failure to attempt to facilitate the procedure.

The ALJ also determined that CMS's conclusion that the noncompliance rose to the level of immediate jeopardy to the Resident was not clearly erroneous. Because the Resident could have suffered severe consequences if he had aspirated a tooth or bacteria from his mouth, Putnam placed him at risk of serious injury, harm, impairment, or death by failing to ensure that the Resident had his teeth extracted. Finally, the ALJ concluded that the amounts of the per-day fines were reasonable.

13

6.

*The Board's Decision*

Both Putnam and CMS appealed the ALJ's decision to the Board. Putnam challenged the ALJ's finding of noncompliance for the period of July 25, 2014, through October 15, 2014,[5] while CMS requested review of the ALJ's finding that Putnam was in substantial compliance between February and July of 2014. After hearing from the parties, the Board affirmed the ALJ's determination that Putnam was noncompliant with 42 C.F.R. § 483.25 at the immediate jeopardy level between July and October 2014, but reversed the finding that Putnam was in substantial compliance between February and July.

First, the Board determined that the ALJ had correctly interpreted 42 C.F.R. § 483.25 as requiring Putnam to follow up on the oral surgeon's determination that the Resident's teeth had to be extracted. The Board determined that the regulation imposes on nursing facilities an affirmative duty to seek to achieve favorable outcomes to the highest practicable degree:

> A proper reading of [42 C.F.R. § 483.25], and the Board's holdings as to its meaning, is that where, as here, a [facility] knows of a care or treatment that is needed to improve a resident's level of well-being, the [facility] must take action toward providing that care or treatment, regardless of whether

[5] Petitioner did not dispute the finding of noncompliance between October and December of 2014 or the reasonableness of the amount of the fine, and the Board upheld those determinations.

14

the care ultimately is not provided based on the facility's assessment that it cannot be provided in a manner consistent with the resident's overall condition. While a resident's condition may be relevant to the final judgment about whether or when to proceed with a treatment identified as necessary, it is not a justification for simply failing to pursue any medical clearances needed for the treatment.

A.R. 47.

The Board concluded that because the tooth extraction was necessary for the Resident's health -- even if it was not his most pressing medical need -- Putnam failed to comply with the quality of care requirement by failing to make any efforts to schedule the extraction until prompted to do so by the surveyors. Accordingly, the Board rejected Putnam's assertion that the staff was following Dr. Skaggs's October 16, 2013 order.[6] The Board agreed with the ALJ's determinations that Dr. Skaggs never addressed the Resident's dental needs, and that there was no contemporaneous evidence demonstrating that Dr. Skaggs determined that the Resident could not tolerate the procedure. In making this conclusion, the Board noted that the Resident's condition fluctuated between October 2013 and October 2014, that there were multiple requests for medical clearance from Mountain State during that time, and that other physicians who treated the Resident noted his need for the oral surgery.

Second, the Board concluded that the ALJ erred in finding that the noncompliance did not begin until July 25, 2014. The Board reasoned that the ALJ's finding that Putnam

---

[6] As the Board explained in its decision, Putnam asserted that Dr. Skaggs's October 16, 2013 note constituted a "specific medical judgment" or "order" that the Resident "could not tolerate the oral surgery." A.R. 51–52.

15

failed to follow up on Mountain State's February 17, 2014 request for medical clearance was inconsistent with the ALJ's conclusion that the noncompliance did not begin until July. Rather than "trying to discern [the Resident's] ability to tolerate the surgery at any given time," the Board stated that the ALJ should have focused on Putnam's failure to take any steps toward facilitating the extraction surgery. A.R. 57. The Board concluded that Putnam did not take the proper steps even to determine whether the Resident was able to undergo the extraction surgery. Thus, because Putnam failed to follow up after the Resident's February 17, 2014 appointment with the oral surgeon, the Board determined that Putnam's noncompliance began at that time. Accordingly, the Board imposed CMS's original fine.

On March 6, 2018, Putnam filed a petition for review of the Board's decision with this court.

## II.

The scope of judicial review of agency decisions is "'narrow,' and we must not substitute our judgment for that of the agency." *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Where a facility challenges the agency's interpretation of its own regulation, we "must give the agency's interpretation substantial deference." *Almy v. Sebelius*, 679 F.3d 297, 307 (4th Cir. 2012) (internal quotation marks omitted). Consistent with that substantial deference, the agency's interpretation must be given controlling weight unless it is "arbitrary, capricious, . . . or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

16

Under 42 U.S.C. § 1320a–7a(e), the agency's factual findings, "if supported by substantial evidence on the record considered as a whole," are conclusive. "Substantial evidence" means "relevant evidence" that "a reasonable mind might accept as adequate to support a conclusion." *Universal Healthcare*, 499 F. App'x at 303 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## III.

Putnam raises three arguments in its petition for review: (1) the Board's interpretation and application of the quality of care regulation, 42 C.F.R. § 483.25, was arbitrary and capricious; (2) the Board's factual determinations were not supported by substantial evidence in the record when considered as a whole; and (3) the Board applied an incorrect standard of review by improperly considering CMS's factual allegations and legal conclusions to be "presumptively correct," Pet'r's Br. 37. We address each in turn.

## A.

### *The Board's Interpretation of 42 C.F.R. § 483.25*

First, Putnam asserts that the Board's interpretation of the quality of care requirement in 42 C.F.R. § 483.25 "created a novel legal standard." Pet'r's Br. 39. Specifically, Putnam argues that the Board's interpretation requires a nursing home to facilitate all procedures necessary for a resident, even where (1) a physician's order limits or places a condition on such service; (2) the resident is not physically capable of undergoing the procedure; (3) the facility itself cannot provide that service; and (4) and the resident is satisfied with delaying the procedure. According to Putnam, such an interpretation of the regulation "require[s] the impossible." *Id.*

17

In light of the substantial deference given to the Board's interpretation of its own regulation, Putnam has failed to establish that the four circumstances noted above must be interpreted as exceptions to 42 C.F.R. § 483.25. Further, these circumstances are irrelevant to the enforcement of § 483.25, rely on a misunderstanding of the law and the facts, or are simply not present in this case.

As an initial matter, the first two circumstances Putnam asserts – (1) Dr. Skaggs's October 16, 2013 note constituted an order placing a condition on the Resident's full dental extraction procedure; and (2) the Resident was too ill to undergo the procedure during the period of noncompliance -- are both factual matters masquerading as legal arguments. Putnam argued before the Board that a nursing home need not facilitate a surgery where a medical order advises against or prohibits it. The Board disagreed with Putnam's premise: "Putnam's argument that staff were following Dr. Skaggs'[s] medical judgment or order assumes the actual existence of a medical judgment or order, an assumption that the ALJ found, and we agree, is not supported by substantial evidence in the record." A.R. 52 n.15. In other words, the Board concluded that neither of these factual circumstances were present in this case.[7] Thus, we need not address whether 42

---

[7] The dissent argues that "[w]e cannot simply discount the ALJ's factual determination that the Resident could not safely undergo the procedure until July 2014." Post at 27. But it is the Board's decision, and not the ALJ's, that is before us. Further, even before the Board, the ALJ's conclusions were not unassailable. *See* A.R. 45 ("The Board reviews a disputed finding of fact to determine whether the finding is supported by substantial evidence, and a disputed conclusion of law to determine whether it is erroneous."). The dissent's contention that "some" records supported the ALJ's conclusion, post at 27, cannot overcome our own standard of review: whether the Board's
(Continued)

18

C.F.R. § 483.25 can be interpreted to require nursing facilities to violate a doctor's orders. Indeed, we agree with the Board that "[t]he legal issue in this case does not involve a [facility's] legal liability for a physician's medical judgment or order." *Id.*

As for the third circumstance, Putnam argues that the Board's interpretation of 42 C.F.R. § 483.25 is arbitrary and capricious because it holds nursing facilities responsible for care that they do not, and cannot, provide. This argument relies on both a misreading of the regulation and a misunderstanding of how Putnam violated it.

Putnam understands the Board's decision to be punishing it for failing to *perform* the extraction surgery. That is not the case. The Board found Petitioner in violation of 42 C.F.R. § 483.25 because it failed to perform *the tasks required* for the Resident to receive the extraction surgery, such as obtaining the Resident's medical clearance and scheduling the surgery. Indeed, Putnam's noncompliance precedes the failure to ensure that the Resident received the surgery. Rather, Putnam's noncompliance stems most fundamentally from its failure to take any steps to determine whether the Resident was able to undergo a surgery that all parties agree was necessary to maintain the Resident's highest practicable health. The Board was very clear on this point. *See* A.R. 52 n.15 ("[T]he legal question is whether Putnam's staff violated section 483.25 by not taking all reasonable steps toward scheduling the oral surgery they knew [the Resident] needed . . . .").

---

finding was "supported by substantial evidence on the record considered as a whole." 42 U.S.C. § 1320a–7a(e).

19

Petitioner reads the regulation to carve out from the responsibilities of nursing facilities forms of care that nursing facilities do not themselves provide. But the regulation does not compel such an interpretation, and it was certainly not "impossible" for Putnam to contact its own Medical Director, Dr. Skaggs, to obtain a medical clearance for the Resident. *See* Pet'r's Br. 40 ("It is a venerable rule that no law or regulation can command the impossible."). Accordingly, Putnam cannot overcome the substantial deference given to the Board's interpretation on this basis.

Finally, as for the fourth circumstance, Putnam asserts that the Board's interpretation of 42 C.F.R. § 483.25 is arbitrary and capricious because the Resident did not complain about the delay in receiving the surgery and the Resident testified before the ALJ that he believed Putnam did nothing wrong. However, as the Board noted, "Putnam cites no authority for its suggestion that a [skilled nursing facility] has no duty to provide necessary care and services to a resident under section 483.25 if the resident does not demand the care or services or object to their not being provided." A.R. 50. Indeed, protesting resident or not, the regulation requires nursing facilities to provide their residents with the care necessary to maintain their highest practicable health, and the Resident's contentment with the delay plays no role in this analysis.[8]

---

[8] Significantly, this is not a case of a nursing facility being held liable for not providing care that a resident *refused*. Here, the record contains no evidence that the Resident opposed the surgery. Indeed, the Resident signed a consent form at the time of his February 17, 2014 consultation with the oral surgeon.

Accordingly, Putnam has not established that the Board's interpretation of 42 C.F.R. § 483.25 was arbitrary, capricious, or otherwise contrary to law.

B.

*The Board's Factual Determinations*

Putnam next asserts that the Board's factual determinations were not based on substantial evidence in the record as a whole. Specifically, Putnam challenges the Board's interpretation of the significance of Dr. Skaggs's October 16, 2013 note and the Resident's health conditions.

The Board determined that Dr. Skaggs's note did not amount to an evaluation of the Resident's ability to undergo the extraction surgery nor did it suffice to provide the required medical clearance for the surgery. Putnam disagrees with that assessment of the evidence. Putnam argues that Dr. Skaggs ordered that the Resident only undergo the procedure under minimal sedation, and that Putnam's staff had no authority to undermine that order.

But Putnam's assertions are belied by the record, and we find that the record contains evidence that a reasonable mind would accept as sufficient to support the Board's conclusion that Putnam did not comply with agency regulations. While Putnam's argument is centered on the views of Dr. Skaggs, the ALJ explicitly concluded that Dr. Skaggs was not a credible witness. *See* A.R. 20 ("Taken as a whole, I do not find credible Dr. Skaggs'[s] testimony that [the Resident] was too sick from July 2014 through October 2014 to have the teeth extraction procedure. . . . I find that Dr. Skaggs'[s] testimony was, at times, unconvincing, evasive, and contradictory."); *id.* at 23

21

("I accept as credible and persuasive Dr. Cheifetz's expert opinions, and . . . find that his testimony undermined the credibility of Dr. Skaggs."). The record provides ample support for that conclusion. Although Dr. Skaggs testified that the Resident was not healthy enough for the extraction to proceed, there is no documentation of that determination in the Resident's medical chart. Indeed, there is no indication in the chart that Dr. Skaggs ever again considered the Resident's teeth or his ability to undergo the extraction after Dr. Skaggs wrote the October 2013 note. And while the letter Dr. Skaggs wrote after the survey stated that the Resident was not medically stable enough for dental extraction from February through June 2014, Dr. Skaggs testified at the hearing that the Resident was not stable enough until the day the pulmonologist gave clearance in October 2014. Skaggs offered no explanation for his shifting, after-the-fact views of the Resident's medical condition. Putnam's arguments on appeal are therefore premised on a view of the facts that was rejected by the ALJ.

Moreover, this post-hoc rationalization for Dr. Skaggs's failure to follow up on the Resident's dental procedure does not amount to evidence that Petitioner was acting to maintain the Resident's highest practicable well-being. This is especially true in light of the fact that just one week after the surveyor interviewed the Resident, Putnam scheduled a consultation with the Resident's pulmonologist and obtained clearance for the surgery.

But even if Putnam's reading of Dr. Skaggs's October 20, 2014 letter were correct, this would not excuse Putnam's failure to follow up after the Resident's February 17, 2014 oral surgery consultation. Despite Mountain State's repeated requests for the Resident's medical clearance, Putnam never communicated to Mountain State that Dr.

22

Skaggs had already given clearance with limited anesthetic options (in the form of the October 16, 2013 note), nor did it obtain the updated (and sufficient) clearance that Mountain State requested.

In addition, Putnam failed to demonstrate that the oral surgeon demanded that the procedure be done under general anesthesia -- which is the entire premise of Putnam's argument against noncompliance. There is evidence that the dentist noted that clearance for IV anesthesia was needed. But there is no evidence that Dr. Skaggs ever spoke to either the dentist or the oral surgeon to discuss the matter. Even if Putnam believed that Mountain State was attempting to locate a physician who would conduct the procedure under the limited anesthesia options identified in Dr. Skaggs's October 16, 2013 note, Putnam failed to take any action to see that the procedure was being scheduled in the eight months between the oral surgery consultation and the survey.

Finally, we note that Putnam offered competing and contradictory explanations for its failures. While Putnam points to Dr. Skaggs's statement that the Resident was too ill to undergo the procedure, Putnam also claims that its staff was waiting on Mountain State to procure an anesthesiologist who would perform the procedure without general anesthesia. These claims cannot both be true -- either the Resident was too ill to undergo the surgery and there was no reason to attempt to schedule it until he was better, or efforts were underway to schedule the procedure by another party. The best interpretation of the inconsistent testimony -- and the interpretation reached by both the ALJ and the Board -- is that Putnam failed to ensure that the Resident had this necessary procedure until it was

23

prompted to do so by OHFLAC's survey. Accordingly, the Board's factual determinations were based on substantial evidence in the record.

## C.

### *The Board's Standard of Review*

Finally, Putnam argues that the Board's decision is arbitrary and capricious because the Board failed to follow the burden-shifting framework required by *Hillman Rehabilitation Center*, DAB No. 1663, at 8 (H.H.S. 1998). In *Hillman*, the Board explained that the statutory goal of protecting nursing facility patients requires application of a burden-shifting analysis: CMS bears the initial burden of proof to demonstrate a prima facie case of noncompliance, and the petitioner bears the ultimate burden of persuasion. The parties agree that *Hillman*'s burden-allocation applies to review of CMS decisions. But Putnam claims that the agency has strayed from it, arguing that the agency both has broadly abandoned the *Hillman* rule and failed to apply it in this case. *See* Pet'r's Br. 36–37 ("But about ten years ago, the Board inexplicably abandoned the *Hillman* rule, and now says that it is *not* bound by APA standards . . . ."). According to Putnam, this change in enforcement policy itself rendered the Board's decision arbitrary and capricious.[9]

We decline to address this argument because Putnam did not raise it below. Indeed, 42 U.S.C. § 1320a–7a(e) makes clear that "[n]o objection that has not been urged

_____

[9] We note, however, that Putnam cites no authority to support its contention that the Board "inexplicably abandoned the *Hillman* rule" ten years ago or that it uses the appeals process "to impose sanctions de novo." Pet'r's Br. 37.

before the Secretary shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Putnam has not alleged that any extraordinary circumstances excuse its failure to raise this argument before the Board. Accordingly, in line with our prior decisions, "we will not consider the merits of this contention." *Universal Healthcare/King v. Sebelius*, 499 F. App'x 299, 303 (4th Cir. 2012) (rejecting petitioner's argument that the Secretary of HHS failed to apply the correct legal standard because petitioner did not raise it before the Secretary); *see also Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36–37 (1952).

## IV.

For these reasons, we conclude that the Board's determination that Putnam did not comply with agency regulations is supported by substantial evidence and that the Board's interpretation of the regulations is not arbitrary, capricious, or otherwise not in accordance with the law. Putnam's petition for review is therefore denied.

*PETITION DENIED*

RICHARDSON, Circuit Judge, dissenting:

Putnam, a skilled nursing care facility providing service under Medicare, was required to provide each resident in its care with the "necessary care and services to attain or maintain the highest *practicable* . . . well-being." 42 C.F.R. § 483.25 (2014) (emphasis added). A federal agency found that Putnam violated this requirement by not obtaining dental surgery for a resident from February through October 2014. As a result, the agency fined Putnam $1,229,100: $5,100 for each day of noncompliance.

After a hearing challenging that penalty, the Administrative Law Judge ruled that Putnam's noncompliance was limited to July through October. The ALJ found that, before July, Putnam was in compliance because the Resident was too sick to undergo surgery under general anesthesia. On appeal, the Departmental Appeals Board reinstated the full penalty for noncompliance from February through October.

The Board's decision to reinstate the full penalty did not reject the ALJ's factual findings about the Resident's ability to tolerate surgery. Rather, the Board concluded that the ALJ should not have considered the Resident's health at all. According to the Board, the focus should be *solely* on the steps taken by Putnam to coordinate the surgery. The Board rejected the ALJ's decision to "discern [the Resident's] ability to tolerate the surgery at any given time," because it was "not the responsibility of the ALJ to attempt to determine retrospectively, on that inadequate record, what medical judgment would have been appropriately made at the time." J.A. 57. In other words, Putnam's noncompliance resulted from failing to take steps to arrange the Resident's surgery, even if the Resident's health made surgery impossible. *See id.*

26

Yet Putnam had to provide only the "necessary care" to achieve the highest "practicable" well-being for the Resident. 42 C.F.R. § 483.25 (2014). The Board here determined that it was "necessary" to take steps to schedule a surgery that the ALJ determined the Resident could not endure before July 2014. But the requirement to provide "necessary care" does not encompass tasks required for a surgery that could not happen. Scheduling a surgery date, arranging transportation, or filling out paperwork for a surgery that cannot take place would do nothing—much less be "necessary"—to achieve the Resident's highest "practicable" well-being.

To be clear, a different factfinder might disagree with the ALJ's factual determination that the Resident was unable to undergo the general anesthesia surgery until July 2014. In reaching this conclusion, the ALJ relied heavily on a questionable, post-hoc letter from the treating doctor, while also discounting the same doctor's oral testimony that the Resident could not undergo surgery even in August. On top of that, there were no contemporaneous records showing that Putnam was regularly re-evaluating the Resident's ability to undergo general anesthesia. Yet the ALJ still found that the Resident could not undergo the surgery until July 2014, and some contemporaneous hospital records supported that conclusion.

Standing in the ALJ's shoes, I might not have reached the same conclusion. But neither the Board nor this Court stands there. We cannot simply discount the ALJ's factual determination that the Resident could not safely undergo the procedure until July 2014. As a result, I respectfully dissent.

27